**Elizabeth MEIMAN, Appellant,**

v.

**REHABILITATION CENTER, INC., et al.,
Appellees.**

Court of Appeals of Kentucky.

May 30, 1969.

George K. Harris, Louisville, for appellant.

Ernest H. Clarke, McElwain, Dinning, Clarke & Winstead, Louisville, for appellees.

DAVIS, Commissioner.

In Elizabeth Meiman's suit against Rehabilitation Center, Inc., and certain of its employees, based on the alleged negligence of the defendants resulting in Mrs. Meiman's injury, the trial court directed a verdict in favor of the defendants. From the judgment entered on that directed verdict, Mrs. Meiman prosecutes this appeal.

On or about March 31, 1964, Mrs. Meiman presented herself to the Rehabilitation Center seeking treatment which would enable her to walk with the use of an artificial limb. Due to complications arising from her diabetic condition, an amputation of Mrs. Meiman's left leg above the knee had been performed about three years before she sought the services of the Rehabilitation Center. Although she had purchased an artificial limb shortly after the amputation, Mrs. Meiman had never been able to use the prosthesis. After Mrs. Meiman was released from the hospital following the amputation, she used a wheel chair in order to get about, and she has continued to remain dependent upon that device. Mrs. Meiman was anxious to use an artificial leg and learned that the Rehabilitation Center might be able to administer rehabilitative treatments which would enable her to do so.

When she presented herself at the Center, she was about sixty-three years of age, rather obese, and a diabetic patient

of long standing. She was initially examined by the appellee, Dr. Luis Spamer, an employee of the Center and a physician trained in the speciality of rehabilitative medicine. Dr. Spamer took the patient's history and made a clinical examination of her, although he did not obtain X rays on the occasion of her first visit. He concluded that she was a "candidate" for rehabilitation through therapy treatments and prescribed a course of therapy for her. The record is silent as to whether he discussed in person with any therapist the prescription which he had formulated. It was shown that at that time Mrs. Meiman suffered some severe muscle atrophy, osteoporosis, flabbiness of the stump on the amputated limb, and contracture of positions of her body. These conditions developed because of the long nonuse of the affected portions of the body during Mrs. Meiman's extended confinement in the wheel chair. Dr. Spamer recognized the presence of all these conditions and considered that there was a reasonable prospect that therapeutic treatment could bring about the desired result in her case.

Mrs. Meiman had two treatments at the Center before April 12. These treatments were administered by the appellee, Julia Norris, and transpired without incident. Mrs. Norris did not recall in detail the extent of the therapy she had used in the first two treatments. On April 12, Mrs. Norris was preparing to perform a therapeutic routine, looking toward the stretching of the contracted and atrophied muscles and ligaments, in which the good right leg was to be raised so that the knee would be bent and pointed toward the patient's chest. In performing this exercise, it was necessary that the stump of the left limb be maintained in place while the patient lay on her back on a table, else the routine would be useless. Mrs. Norris realized that she could not bring the patient's right leg into the desired position without having someone hold down the stump on the left leg. She called the appellee, John Sharp, to assist her in the procedure. Sharp was not a physical therapist by training or experience but merely an aide or orderly. Mrs. Norris said she told Sharp how to apply his hands so as to effectively hold down the stump. Mrs. Meiman testified that Sharp "slammed" the stump of her left leg down on the table with great force, thus breaking the bone. Sharp and Mrs. Norris denied it.

As Mrs. Norris was raising the patient's right leg toward her chest, Mrs. Meiman screamed in pain, and the procedure was immediately discontinued. A conference between Mrs. Meiman and other officials of the Center was had, and Mrs. Meiman was directed to go home and return the following Monday. When she did return on Monday, X rays were taken and it was disclosed that there was a fracture of the neck of the femur as it enters the hip. No corrective procedure was undertaken at the Center respecting this fracture. When Mrs. Meiman submitted herself to the physicians who had performed the amputation, they concluded that it would be useless to attempt reduction of the fracture by surgery in light of her extremely critical diabetic condition. These doctors opined that Mrs. Meiman's condition following the fracture foreclosed any reasonable possibility of her ever being able to use an artificial leg.

It was shown that Mrs. Norris was a graduate in physical therapy of the University of Indiana and had had some in-training experience in that science. However, at the time of the accident she had not obtained a Kentucky license for practicing physical therapy, as required by KRS 327.050. It was explained that Mrs. Norris had finished her schooling too late to take the regular examination before entering upon duty at the Center and that she did take the examination in October 1964 and passed it on the first attempt. She had been employed at the Center about a week at the time of Mrs. Meiman's alleged injury.

Before undertaking treatment of Mrs. Meiman, the Center required her to

execute an exculpatory agreement which provided in part:

"I further agree that, I will assume all risks which have been explained to me in detail that can result from my attending the Center and at prescribed activities outside the Center, and from diagnosis and treatment. I will not assert any claim against the Center, its employees, or its volunteers that results from unintentional acts or conduct on their part."

The appellees relied upon the exculpatory writing when making their motion for directed verdict in the trial court, but in their brief filed on this appeal, they place no reliance upon it but content themselves with asserting that there was no proof that any of the appellees failed to exercise the standard of care required. Since there may be another trial of this action, we deem it appropriate to observe that the exculpatory contract may not be relied upon as a defense in this action, because it is invalid as being against public policy. See Tunkl v. Regents of Univ. of Calif., 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R. 3d 693, and the annotation beginning at 6 A.L.R.3d 704. In the annotation it is stated in part: "The general rule is that persons may not contract against the effect of their own negligence and that agreements which attempt to do so are invalid." 6 A.L.R.3d 705.

The annotation points out that the decisions recognize that in some instances such an agreement may be valid,[1] but that in no event can such an exculpatory agreement be upheld where either "(1) the interest of the public requires the performance of such duties, or (2), because the parties do not stand upon a footing of equality, the weaker party is compelled to submit to the stipulation." 6 A.L.R.3d 705. In our view, the case at bar is one in which it is clearly against public policy for the Center to seek refuge in the exculpatory agreement.

Upon another trial, evidence relating to the agreement will not be admitted.

■ Appellees maintain that appellant must fail because she has not presented medical evidence supporting the proposition that the procedure was not administered with the skill and diligence generally employed by other members of the same healing art in the locality under like circumstances. Appellees call attention to Merker v. Wood, 307 Ky. 331, 210 S.W.2d 946; Steinmetz v. Humphrey, 289 Ky. 709, 160 S.W.2d 6; and cases of similar tenor in support of their argument. Many other cases along the same line could be cited, and we have no quarrel with them. However, there are cases, including Jarboe v. Harting, Ky., 397 S.W.2d 775, and Jewish Hospital Association of Louisville, Kentucky, Inc. v. Lewis, Ky., 442 S.W.2d 299, decided February 28, 1969, in which this court has recognized an exception to the rule requiring expert testimony in malpractice cases "in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." Jarboe v. Harting, Ky., 397 S.W.2d at 778. In light of the principle iterated in Jarboe and cases cited and discussed in it, we consider that the evidence presented in behalf of the appellant was sufficient to create a submissible jury issue as to whether the Center's employees were negligent in the administration of therapy to the appellant and whether such negligence, if any, proximately caused injury to her.

There was medical testimony to the effect that the type of stretching procedure utilized in this case is normal and proper. There was no suggestion from the witnesses that such procedure could or would normally result in fracturing the bones of the patient, and it is implicit in all the evidence on this point that the procedure, when properly administered, will not so result. Medical testimony implied that the

1. Cf. Cobb v. Gulf Refining Co., 284 Ky. 523, 145 S.W.2d 96, which is readily distinguishable on its facts.

procedure is one which must be applied "judiciously." Mrs. Norris recognized that it would not do to apply excessive force in stretching the right leg or in holding down the stump. In short, the evidence supports the view that a patient suffering the disability exhibited by Mrs. Meiman could receive properly administered therapy of the type involved here without untoward incident. The fracture of the patient's bone would warrant the jury's belief that proper precautions were not taken in the procedure. Cf. Quillen v. Skaggs, 233 Ky. 171, 25 S.W.2d 33, in which this court recognized that the doctrine of *res ipsa loquitur*, although not usually applicable in malpractice cases, may be invoked in circumstances in which the generally accepted procedures are not calculated to produce the abnormal results asserted by the plaintiff. Of like import is Merker v. Wood, 307 Ky. 331, 210 S.W.2d 946. It is our view that the present case falls within the rationale of the decisions just discussed and that the evidence for Mrs. Meiman was sufficient to raise a permissible inference of negligence.

■ It is appropriate to observe that it was also erroneous for the trial court to receive evidence that Mrs. Norris was unlicensed as a physical therapist. Whether or not she was licensed had no relevance to the question of her negligence. If she was negligent, the Center is liable; if not, the Center is not liable based on her conduct.

Appellees seek to maintain that none of them was negligent; hence, the Center must be absolved, as its liability is purely derivative. In the present state of the record, we are unable to say that any of the appellees has been shown to be so free of negligence as to warrant a directed verdict for any of them. The activities of Dr. Spamer in prescribing the treatment may not be said to constitute negligence, but his failure to fully explain the procedure to the therapist (as another medical witness explained to be the proper practice) would support a jury's finding of his liability. The failure of Mrs. Norris' immediate

supervisor to furnish supervision to the relatively inexperienced Mrs. Norris may well be deemed by the jury as evincing lack of care on her part. The activities of Mrs. Norris and John Sharp were susceptible of being characterized as negligent if the jury accepts the view presented by the appellant.

The judgment is reversed with directions to grant the appellant a new trial.

All concur.