## 59966. PORUBIANSKY v. EMORY UNIVERSITY et al.

SOGNIER, Judge.

Appellant, plaintiff in the lower court, applied and was accepted as a patient of Emory University's School of Dentistry Clinic. Appellant was advised that all treatment at the clinic would be by dental students and employees under the direction of a licensed dentist or by a licensed dentist. Appellee Emory University is a private institution and its School of Dentistry is involved primarily in dental research and the education of dental students.

The clinic charges less for treatment than is generally charged by dentists practicing in the Atlanta area. However, there is no indication that appellant sought her dental treatment at Emory because of economic necessity. Prior to accepting a patient for treatment, Emory requires each patient to execute an information consent form in consideration of dental services to be rendered to the patient. This form was signed by appellant on October 26, 1976. The pertinent parts of the form are set forth:

"EMORY UNIVERSITY SCHOOL OF DENTISTRY INFOR-MATION-CONSENT FORM
"Dear Prospective Patient.

"Please read the following information carefully to avoid any misunderstanding.
"Emory University School of Dentistry conducts its Dental Clinic to teach and prepare dental students for the practice of Dentistry.

"In consideration of Emory University School of Dentistry performing dental treatment, I do hereby expressly waive and relinquish any and all claims of every nature I or my minor child or ward may have against Emory University, its officers, agents, employees, or students, their successors, assignees, administrators, or executors; and further agree to hold them harmless as the result of any claims by said minor child or ward, arising out of any dental treatment rendered, regardless of its nature or extent."

Appellant began treatment on November 30, 1976, received numerous treatments and paid her charge separately for each treatment. On April 19, 1977 Dr. Haddad, an employee of Emory dental clinic, removed appellant's impacted tooth. During this procedure Dr. Haddad, also a defendant and appellee, noticed that appellant's jaw was broken.

Appellant sued Emory University and Dr. Haddad alleging that her jaw was broken negligently during removal of the impacted tooth; appellees denied this allegation, and pleaded the exculpatory clause contained in the information consent form as a defense and moved for

summary judgment on this basis. The facts are not in dispute except as to the injury and causation, with which we are not now concerned.

The trial court held that the exculpatory clause in the consent form executed by appellant prior to treatment was valid and granted summary judgment to appellees. Porubiansky contests that judgment.

Appellant's sole enumeration of error is that the trial court erred in granting appellees' motion for summary judgment as the exculpatory clause relied upon by appellee violates the public policy of the State of Georgia, and is void as a matter of law. This is a case of first impression in our courts.

" 'It is well settled that contracts will not be avoided by the courts as against public policy, except "where the case is free from doubt and where an injury to the public interest clearly appears." ' " *Cash v. Street & Trail,* 136 Ga. App. 462, 465 (221 SE2d 640) (1975). Unless prohibited by statute or public policy, the parties are free to contract on any terms and about any subject matter in which they have an interest, and any impairment of that right must be specifically expressed or necessarily implied by the legislature in a statutory prohibition and not left to speculation. *Brown v. Five Points Parking Ctr.,* 121 Ga. App. 819, 821 (175 SE2d 901) (1970). A contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is contrary to good morals and contrary to law, or unless the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of law. *Camp v. Aetna Ins. Co.,* 170 Ga. 46, 50 (152 SE 41) (1929); *Brown v. Five Points Parking Ctr.,* supra, at p. 821.

Except in cases prohibited by statute and cases where a public duty is owed, the general rule in Georgia is that a party may exempt himself by contract from liability to the other party for injuries caused by negligence, and the agreement is not void for contravening public policy. *Hawes v. Central of Ga. R. Co.,* 117 Ga. App. 771, 772 (162 SE2d 14) (1968). Code Ann. § 102-106 provides: "Laws made for the preservation of public order or good morals cannot be done away with or abrogated by any agreement; but a person may waive or renounce what the law has established in his favor, when he does not thereby injure others or affect the public interest."

Code Ann. § 20-504 provides for a statutory prohibition against contracts made in violation of public policy and enumerates some examples where such contracts will not be enforced, i.e., "contracts tending to corrupt legislation or the judiciary, contracts in general restraint of trade, contracts to evade or oppose the revenue laws of

another country, wagering contracts, contracts of maintenance or champerty." In addition, under this code section an agreement made in connection with a building construction contract which purports to indemnify the contractor against liability for negligence is against public policy and void.

Historically, our courts have viewed any interference with freedom to contract with considerable caution. In this regard, our Supreme Court has stated: "The power of the courts to declare a contract void for being in contravention of a sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. The authority of the lawmaking power to interfere with the private right of contract has its limits, and the courts should be extremely cautious in exercising the power to supervise private contracts which the lawmaking power has not declared unlawful." *Equitable Loan & Security Co. v. Waring,* 117 Ga. 599 (1) (2) (44 SE 320) (1903). With regard to Code Ann. § 20-504, this court has held: "The provisions of the Civil Code (1910), § 4253 et seq., [now § 20-504] should not be enlarged without convincing and conclusive reasons . . . 'It is well settled that contracts will not be avoided by the courts as against public policy, except where the case is free from doubt, and where an injury to the public interest clearly appears.' " *Mut. Life Ins. Co. v. Durden,* 9 Ga. App. 797, 800 (3) (72 SE 295) (1911). "The only authentic and admissible evidence of public policy of a State is its constitution, laws, and judicial decisions." *Mut. Life Ins. Co. v. Durden,* supra at p. 800 (3).

We are not now concerned with a contract such as those specifically enumerated in § 20-504. There have been cases, however, where this court has found that a contract which does not come within the parameters of § 20-504 has been violative of public interest and policy.

In *Country Club Apts. v. Scott,* 154 Ga. App. 217, 220 (267 SE2d 811) (1980); affirmed, 246 Ga. 443 (1980), this court held an exculpatory clause in a landlord-tenant agreement to be void and stated: "A landlord's implied warranty concerning latent defects existing at the inception of the lease is sufficiently analogous to a contract for maintenance or repair that an exculpatory provision purporting to nullify the effect of the implied warranty is void and unenforceable under Code § 20-504." The court found that the landlord's warranty existed by operation of law in the interest of public safety, and was provided for by statute. Code Ann. § 61-111.

In another case not falling within the explicit parameters of § 20-504, this court has ruled that "a special contract between an innkeeper and his guest purporting to limit the innkeeper's liability

to an amount less than that authorized by *Code* § 52-111, is unenforceable as contrary to public interest and policy." *Ellerman v. Atlanta American Motor Hotel Corp.,* 126 Ga. App. 194, 195 (191 SE2d 295) (1972). The court viewed an innkeeper as a "professional" bailee as opposed to an "ordinary" bailee and stated that ". . . the 'professional' bailee is often precluded from limiting by contract liability for his own negligence as violative of public policy. The reasoning utilized is that the public, in dealing with innkeepers, lacks a practical equality of bargaining power and may be coerced to accede to the contractual conditions sought by the innkeeper or else be denied the needed services. We think that both the principle precluding the limitation of liability and the reasoning underlying it are sound. The General Assembly by *Code* § 52-111 authorizing a limitation of liability has pre-empted the field on that subject. We are therefore constrained to hold that the legislative pre-emption cannot be avoided by a special contract and that any such contract purporting to further exculpate the innkeeper is contrary to the public interest and policy and cannot be enforced."

In *Bishop v. Act-O-Lane Gas Serv. Co.,* 91 Ga. App. 154 (85 SE2d 169) (1954) the court dealt with an exculpatory clause in favor of a gas company for any resulting damage caused by the negligence of the gas company in installing equipment and servicing the premises with butane gas. Again, this situation is not enumerated in § 20-504. Safety regulations regarding the installation of such gas were provided for by statute and regulations. In such a case, the court held that ". . . it would be contrary to the regulations, and accordingly contrary to law, for the parties to agree that it be made in violation thereof. Such agreement would be against public policy and therefore void." *Bishop,* supra at p. 166.

Mindful of the rule set forth in *Durden,* supra, we turn now to the public interest aspects of the instant case as set forth in our statutes and judicial decisions. To determine this issue, two questions must be answered. First, is the duty of a dentist to his or her patient a public duty of sufficient gravity to preclude its waiver, and second, is it of equal public import as the relation of landlord and tenant, innkeeper and guest, or petroleum dealer and customer? Both questions must be answered in the affirmative.

The relationship of dentist and patient has been likened to that of the medical doctor and patient. "Since the 'duties and responsibilities of a dentist to his patient are controlled by the same rules of law as control the duties and responsibilities of a physician and surgeon,' the malpractice issue involved here must be decided pursuant to Code Ann. § 84-924." *Gunthorpe v. Daniels,* 150 Ga. App. 113 (1) (257 SE2d 199) (1979); *Wilson v. Kornegay,* 108 Ga. App. 318

(132 SE2d 791) (1963). In medical malpractice complaints made pursuant to Code Ann. § 84-924, "the presumption is that the medical or surgical services were performed in an ordinarily skilful manner, and the burden is on the one receiving the services to show a want of due care, skill, and diligence. [Cits.] And in such a case the proof ordinarily required to overcome such presumption of care, skill, and diligence is that given by physicians or surgeons as expert witnesses. [Cits.]" *Shea v. Phillips,* 213 Ga. 269, 271 (2) (98 SE2d 552) (1957). Code Ann. § 84-924 provides: "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." Since *Gunthorpe,* supra, and *Wilson,* supra, hold that § 84-924 applies to dentists, their failure to perform within the standards set forth therein violates a statutory responsibility.

Under Georgia law the practice of dentistry is a regulated profession licensed by the state. Code Ann. § 84-701 et seq. Code Ann. § 84-701 subjects a dentist to disciplinary action should he fail to meet minimum standards of acceptable and prevailing dental practice. The State of Georgia has indicated its public interest in the practice of dentistry by establishing a licensing process for the profession, establishing a requirement of minimal standards, and by declaring the malpractice thereof a tort. The statute and regulations with regard to dentistry enacted by the General Assembly are for the protection of the public. *Cobb v. Roush,* 144 Ga. App. 501, 502 (241 SE2d 619) (1978). Further, by judicial decision, this court has said that a physician/patient relationship has its foundation in *public considerations. Norton v. Hamilton,* 92 Ga. App. 727 (89 SE2d 809) (1955). The same would apply to the dentist/patient relationship under *Gunthorpe,* supra.

This state has further indicated its public policy concerning the health of its citizens in the Georgia Health Code (Code Ann. § 88-101 et seq.), which creates the Department of Human Resources. One of the duties of this department of state government is to "[p]romote the prevention, early detection and control of problems affecting the dental health of the citizens of Georgia." Code Ann. § 88-108 (g).

Appellees argue that because Emory University School of Dentistry conducts its Dental Clinic primarily for the purpose of teaching and preparing students for the practice of dentistry, the exculpatory clause is not against public policy but is necessary to further the purpose and operation of a dental school. It is undisputed that the clinic charges fees for its services, although such fees are

lower than a patient would normally pay a licensed practitioner in the area for dental care. Code Ann. § 84-722 authorizes dental colleges to maintain and operate college clinics and charge for services rendered therein. The practice of dentistry by students is regulated under this code section which requires that such practice be "under the supervision of registered demonstrators." Although the teaching function of the dental clinic is an important consideration, it cannot be said to be a more important public policy than that of the health and safety of dental patients.

There can be no doubt that dental care for our citizens is an invested public duty; the relationship of dentist and patient and the care given to the patient is of legitimate public interest in our state, even when such care is administered in a dental clinic designed for training and teaching.

The leading case involving exculpatory clauses used in the medical field is Tunkl v. Regents of University of California, 60 Cal. 2d 92, 383 P2d 441, 32 Cal. Rptr. 33 (1963), which involved an action for negligence by a hospital patient against a charitable hospital. The Supreme Court of California there used the following criteria to declare an exculpatory provision shielding a hospital from liability invalid:

(1) It concerns a business of a type generally thought suitable for public regulation.

(2) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

(3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

(4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

(5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

(6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. Tunkl, supra, 32 Cal. Rptr. at 37-38, 383 P2d at 445-446.

Similarly the appellate courts of Kentucky and Tennessee have refused to uphold exculpatory clauses where patients were

undergoing treatment at a medical facility. See Meiman v. Rehabilitation Center, 444 SW2d 78 (Ky. 1969) (action against a rehabilitation center by patient injured in course of therapeutic treatment), and Olson v. Molzen, 558 SW2d 429 (Tenn. 1977) (action against osteopath arising out of performance of an abortion). Both courts adopted the Tunkl criteria in announcing that public policy would not permit the enforcement of such agreements. In Tatham v. Hoke, 469 FSupp. 914 (W. D. N. C. 1979), the federal district court adopted similar criteria in holding invalid a $15,000 damage limitation and 30 day notice requirement contained in a consent form signed prior to an abortion.

We do not find here that all the Tunkl criteria must be met;[1] however, in applying the Tunkl criteria to the case at bar, we note that some similar characteristics are present. Without question the practice of dentistry is suitable for public regulation and is, in fact, regulated by the state. Similarly, appellee Emory is engaged in performing a service of great importance to the public, i.e., it provides dental care and educates and trains members of the dental profession.

Appellee argues that the case at bar is distinguishable from Tunkl because it is a private institution engaged *primarily* in the teaching and training of dental students and does not hold itself out as a treatment facility to the public. We do not find this argument persuasive where the dental clinic, in fact, treats members of the public and holds itself out as willing to perform its services for any member of the public who seeks it and comes within Emory's established criteria for use of such services. We find no real distinction between appellee Emory and the charitable research hospital in Tunkl.

The final three criteria in Tunkl deal with the relative bargaining positions of the parties. Appellee argues that unlike Tunkl there is no contract of adhesion here. In Tunkl the patient, an indigent, was seeking services from a non-profit charitable hospital maintained by the University of California primarily for the purpose of aiding and developing a program of research and education in the field of medicine. No fee was required for services in Tunkl; however, upon admission the patient was asked to sign a release in consideration for services rendered. In such a situation the California court found that the hospital exercised a decisive advantage in

---

[1] Not every criteria articulated in Tunkl must be present in order to find an exculpatory clause invalid, especially where there is a strong public interest element involved. See 58 Ky. Law J. 583 for discussion.

bargaining, and for that reason would not permit the risk of negligence to be shifted to the weaker party. Having signed the agreement, the patient completely placed himself in the control of the hospital and subjected himself to the risk of carelessness.

Appellee contends that since appellant is not indigent, paid for the clinic's services and could have gone elsewhere for the same type of services, no contract of adhesion is present. The crucial factor in determining whether appellees held a superior bargaining position is not that appellant could have gone elsewhere for dental care nor that she was able to pay for the services. Rather, the relative position of the parties here is that of the professional and the lay person, a situation where out of practical necessity, a party must seek assistance from another party with experience and knowledge in a specialized area. Once having entered the relationship of dentist and patient, the professional is then in control of the lay person to the extent that the latter has very little to say about how treatment is to proceed. In the Tennessee and Kentucky cases involving similar exculpatory clauses, the courts recognized the inequality of bargaining positions in each instance and found the contracts void. In Olson v. Molzen, 558 SW2d 429, supra, the court found a contract of adhesion existed where the defendant doctor operated an abortion clinic which required an exculpatory agreement and charged fees for its services; in Meiman v. Rehabilitation Center, 444 SW2d 78, supra, the action was brought against a rehabilitation center, and although the opinion is silent with regard to the question of fees, it recognized the situation as one where the parties did not stand on equal footing and the weaker party was compelled to submit to the stipulation.

We see no reason why an institution devoted to the training of professionals should be permitted to relieve itself from liability simply because of its educational status. We note, in fact, that Dr. Haddad, the attending dentist, was an *employee* of the clinic and *not* a student. The law requires that a dentist possess and exercise a reasonable amount of care and skill, the patient being subject to the dentist's judgment. *Bryan v. Grace,* 63 Ga. App. 373, 379 (11 SE2d 241) (1940). There is a presumption that a physician has exercised the proper degree of care and skill in treating a patient which can be rebutted only by expert testimony that he has not. *Shea v. Phillips,* supra. Dentists also share the advantage of this presumption. *Wilson,* supra. A professional person should not be permitted to retreat behind the protective shield of an exculpatory clause and insist that he or she is not then answerable for his or her own negligence. Olson v. Molzen, supra at 432. To condone a release here could mean that in the future, similar releases might be required by other dentists,

physicians, and professionals.[2]

The public interest of this state would not be served if dentists, or a dental clinic vested with the responsibility of training future dentists, were permitted to relieve themselves from liability for their own negligence. We hold, therefore, that the exculpatory clause in the consent form signed by a patient as a condition of receiving treatment at Emory University School of Dentistry Clinic is, for "convincing and conclusive reasons" (*Durden,* supra), invalid as contrary to public policy. Summary judgment in favor of appellees is, therefore, reversed.

*Judgment reversed. Deen, C. J., and Birdsong, J., concur specially.*

ARGUED JUNE 2, 1980 — DECIDED NOVEMBER 26, 1980 —

*J. Corbett Peek, Jr., William D. Barwick,* for appellant.
*Daniel S. Reinhardt, Kevin Greene,* for appellees.

DEEN, Chief Judge, concurring specially.

I concur fully with the majority opinion. However, I must add that the judiciary should wherever possible avoid establishing public policy, as this is the primary duty of the legislature. The courts generally should refrain from judicial lawmaking through interpretation, legislation or intervention in matters of public policy unless the need and principle involved is clear and convincing. There are two purposes of public policy. One is of utility and one is of principle. Where the matter is one exclusively of utility, I definitely feel the courts should not intervene or establish public policy, as this is best left to our elected representatives and lawmakers. But, as here, where the question is primarily a matter of interpretation and ascertainment of the best legal theory plus application of principle, then I believe this case is sufficiently clear and convincing that our court may in this limited situation extend the standard or rule of

---

[2]The Code of Professional responsibility for attorneys in Georgia provides: "A lawyer should not seek, by contract or other means, to limit his individual liability to his client for his malpractice. A lawyer who handles the affairs of his client properly has no need to attempt to limit his liability for his professional activities and one who does not handle the affairs of his client properly should not be permitted to do so." Canon of Ethics, Rule 3-106, EC 6-6 (Code Ann. Title 9 Appendix.) We see no reason why other professionals, such as dentists, should not be held to a similar standard.

public policy as herein pronounced.[1] Hence my concurring opinion.

BIRDSONG, Judge, concurring specially.

I have absolutely no quarrel with the application of the legal authorities on which reliance is made in this decision nor in the result. However, I feel compelled to enunciate a grave reservation to one portion of what is either expressly or impliedly involved in the decision. This reservation applies to the inclusion of students in the category of persons who may not by contractual agreement limit or avoid the results of their lack of professionalism and thus limit their liability for their acts which amount to simple negligence when held to the standards required of professionals of the discipline in which the student is studying and preparing himself.

I fully agree that a university such as Emory, one of its agencies, such as the dental school, or any of the professional teachers or instructors or employees, may not lawfully contract to indemnify themselves against their professional negligence. That clearly is the context and intent of the cases cited in the principal opinion. The public is entitled to expert professionalism and adherence to the professional standards by professors trained as dentists (or doctors or lawyers, etc.) and licensed by this state as proficient in that discipline. Such expectations also are reasonable of a reputable school of dental education as well as any person performing personal services of the professional type being taught who is acting on behalf of the institution such as an instructor or an employee.

However, I cannot place that same high degree of professionalism upon one who is seeking to learn the discipline and has not yet reached the point of expertise to be entitled to be a graduate of the school, licensed by the state or accepted by the profession as a fully qualified member. As recognized in the principle decision, it is an accepted practice for dental schools (and law schools) to allow its students to develop their professional abilities by working with members of the public. Members of the public are made aware of the student's participation. While it is true that an accepted member of the profession is required to be in supervisory attendance,

---

[1] "Judicial interpretation in hard cases constitutes one important mode of lawmaking. Legislation, of course, is a second. The difference between the two is that the former, when properly exercised, consists of interpreting existing legal standards, while the latter involves developing policies based upon an assessment of public needs as they are articulated by various lobbies and political organizations. Hence, compromise plays a crucial role in the legislative process, but it is totally out of place in the judicial. . ." William A. Parent, "Interpretation and Justification in Hard Cases," 15 Ga. Law Rev. 99, 139 (Fall 1980).

the patient (or client) is also aware that a student is doing the actual work. It is known generally that dental work performed by a student may be obtained at a reduced rate. Common sense evinces the conclusion that the patient exchanges the reduced rate for the training experience obtained by the student and the invaluable teaching vehicle thus available to the school. To deny the student and the school of this valuable "on the job training" perforce would require the beginning professional to obtain such on-the-job training through the medium of the first series of patients available to the new dentist. Surely such an undesirable social result should be avoided.

It is my considered opinion that a student should be excepted from the stringent limitations on liability laid down by the principle decision. A student may well be liable for intentional and wilful torts. But I consider it better reasoning and in the interests of the public to conclude that when a patient knowingly and willingly accepts the services of a student, the patient acknowledges that that same high degree of professionalism cannot be expected and that the patient can contractually (or impliedly) accept an assumption of the risk of dental care that may not be up to the high standards of professionalism expected generally of a member of the dental profession.

I recognize that the position advocated in this concurrence borders on matters of public policy. Thus the status of students and the legal responsibility flowing from their action while in training may well be a matter to be addressed by the state legislature.