64403, 64404. ST. PAUL FIRE & MARINE INSURANCE COMPANY v. MITCHELL et al.; and vice versa.

SOGNIER, Judge.

St. Paul Fire and Marine Insurance Company (St. Paul), Dr. Ronald Kleber's malpractice insurance carrier, filed the instant declaratory judgment action after Mary Sue Mitchell and her husband filed suits against Dr. Kleber, for medical malpractice. After

answers were filed, St. Paul moved for partial summary judgment on the ground that the Mitchells' suit was a tort action not covered under Dr. Kleber's malpractice policy.* The Mitchells and Dr. Kleber moved for summary judgment on all issues. The trial court granted partial summary judgment to the Mitchells and Dr. Kleber requiring St. Paul to defend the malpractice suit against Dr. Kleber. The court denied all motions on the coverage question. St. Paul appeals and the Mitchells cross appeal.

1. Appellant St. Paul contends that the trial court erred in granting summary judgment to appellees because the insurance company had no duty to defend Dr. Kleber under the insurance policy. The trial court's ruling was based on a clause in the insurance policy which provided, in pertinent part: "COVERAGE A-PROFESSIONAL LIABILITY . . . the Company shall have the right and duty to defend in his name and behalf any suit against the *Insured* alleging *damages,* even if such suit is groundless, false or fraudulent . . ."

The trial court followed the rule enunciated in *Loftin v. U. S. Fire Ins. Co.,* 106 Ga. App. 287 (127 SE2d 53) (1962), quoted and cited with approval in *Great American Ins. Co. v. McKemie,* 244 Ga. 84, 85 (259 SE2d 39) (1979), as follows: " 'The true rule is that the duty to defend is determined by the contract; and since the contract obligates the insurer to defend claims asserting liability under the policy; even if groundless, the allegations of the complaint are looked to to determine whether a liability covered by the policy *is asserted.* ' " Thus, the issue in the instant case is not whether Dr. Kleber is *actually liable* to the Mitchells or whether he *actually committed* the acts alleged to be malpractice; the issue is whether a claim has been asserted which falls within the policy coverage and which St. Paul has a duty to defend.

The Mitchells' complaints alleged, inter alia: ". . . Defendant so aroused Mrs. Mitchell's emotions by manipulation of the transference phenomemon that she fell in love with him. Defendant brought about this result by wrongfully manipulating the doctor-patient relationship to the point where Plaintiff's feelings were no longer transferred feelings of love for Defendant as a psychiatrist but direct feelings of love for him as a person, beyond the phenomenon of transference . . . Defendant was negligent in his treatment and counseling of Plaintiff in that he failed to exercise the degree of care and skill, or to possess the degree of knowledge

---

*Appellant does not contest defending that part of the Mitchells' action against Kleber which alleges his failure to discover a brain tumor.

ordinarily exercised and possessed by other psychiatrists with regard to the existing state of knowledge in psychiatry. Defendant was negligent in that he mishandled the transference phenomenon." The complaints further alleged that this mishandling of the transference phenomenon resulted in the doctor having sexual relations with his patient, Mrs. Mitchell.

We recognize that if a claim is asserted which does not fall within the contract coverage then the insurer is relieved of his contractual duty to defend. *Great American Ins. Co.,* supra. However, in our opinion, the allegations set forth above *assert* a claim which falls within the policy coverage.

The policy in question provides that the insurer will "pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as *damages* arising out of the performance of *professional services* rendered or which should have been rendered, during the *policy period,* by the *Insured* or by any person for whose acts or omissions the *Insured* is legally responsible . . ." St. Paul argues that Dr. Kleber's alleged acts are outside the category of professional services for purposes of coverage.

Courts in other states have held that conduct such as that alleged to have been committed by Dr. Kleber may be considered malpractice by a psychiatrist. In Cotton v. Kambly, 101 Mich. App. 537, 541 (300 NW2d 627) (1980), the court stated: "Plaintiff alleges that defendant induced her to engage in sexual relations with him as part of her prescribed therapy. We see no reason for distinguishing between this type of malpractice and others, such as improper administration of a drug or a defective operation. In each situation, the essence of the claim is the doctor's departure from proper standards of medical practice. Therefore, while the facts alleged by plaintiff might also state a cause of action for common law seduction, we do not find that seduction was the gist of her malpractice claim." See also Anclote Manor Foundation v. Wilkinson, (Fla.) 263 S2d 256 (1972), and Zipkin v. Freeman, (Mo.,) 436 SW 2d 753, 761 (1968). In Zipkin the court said: "However, it is an oversimplification to focus on the more spectacular and extreme acts of the doctor as determinative of the issue. Under the extremely broad terms of the policy before us, defendant agreed to pay damages 'based on' — which would also mean resulting from, or caused by, or due to — professional services rendered or which should have been rendered. The word 'damages' is not limited to any particular kind of damage or injury and applies to any claim or suit, with certain specific exceptions not here material. Defendant would limit the damages to the very act itself of professional services, but the policy clearly covers the results and liability flowing from professional services rendered

or which should have been rendered.

"The gravamen of the petition is that defendant did not treat Mrs. Zipkin properly and as a result she was injured. He [allegedly] mishandled the transference phenomenon, which is a reaction the psychiatrists anticipate and which must be handled properly. He [allegedly] mishandled it over a long period of time. As [experts] explained, to take the relationship outside the office into social relationships, 'would allow the patient to develop all sorts of unusual ideas just around the feelings that she has about the doctor' . . ." Thus, we find ample authority for holding that acts such as those alleged in the Mitchells' complaints come within St. Paul's contractual obligation to defend for matters arising out of Dr. Kleber's performance of his professional duties.

St. Paul cites to the contrary Hartogs v. Employers Mut. Ins. Co. of Wis., 391 N.Y. S2d 962 (1977). That case is distinguishable from the facts in the instant case and will not be followed. In Hartogs, after the patient had secured a judgment against the doctor, the doctor brought suit against his insurer seeking recovery of the cost of defending the suit, the insurer having denied liability and having refused to defend. Since a judgment had been rendered against the doctor, he had been adjudicated a wrongdoer. In Hartogs the court stated: "the doctor administering the 'treatment' at all times knew, and has so stated in the previous trial and on this motion, that what he was doing was in no way pursuant to the doctor-patient relationship. The obvious purpose was to permit him to accomplish his personal satisfaction." Id. at 964. "Therefore as between *the plaintiff and his insurer* those actions could not constitute malpractice and were never intended to be included within the protective coverage of the malpractice policy." (Emphasis supplied.) Id. at 965.

However, the New York Court also said: "The distinction to be drawn between the injured party and the insured is clear. No longer is it the law in this state 'that the liability policy existed solely for the protection of the insured' [Cit.] The courts recognize that the injured person also is to be protected." Id. at 964. Thus, the court, as between the insurer and the insured doctor, ruled against the doctor so that he would not be indemnified for his immorality. But the court made a distinction between the doctor's rights as a wrongdoer and the rights of the victim or the injured person to be protected. Of note in the Hartogs case is this statement: "While the appeal was pending, the defendant insurer, despite its disclaimer to Hartogs, settled with the patient and satisfied a reduced judgment." Id. at 963.

In deciding the issue of whether St. Paul should defend, we are not required to find that the doctor's alleged activities were immoral,

illegal or against public policy. At this stage of the litigation, Dr. Kleber has not been adjudicated a wrongdoer and has denied all wrongdoing. We are deciding only that the allegations are sufficient to bring the suit within the ambit of the contract to require the insurer to defend. *Loften v. U. S. Fire Ins. Co.,* supra, *Great American Ins. Co.,* supra.

2. The trial court correctly denied summary judgment to all parties on coverage, reserving this issue for trial, as the issue depends on the resolution of questions of fact. Whether the acts alleged, i.e., the mishandling of the transference phenomenon, amount to medical malpractice or intentional sexual assault requires the testimony of experts, as is required on any other medical subject. Such medical testimony was presented in Zipkin v. Freeman, and in Anclote Manor Foundation, supra. See Seymour v. Lofgreen, Kan., 495 P2d 969, 972 (1972) for a full discussion of the doctrine of transference in psychiatry where the court, quoting from Zipkin, supra, stated: " ' "What is perhaps regarded as the most significant concept in psychoanalytical therapy, and one of the most important discoveries of Freud, is the emotional reaction of the patient toward the analyst known as the *transference* . . .", [Cit.]' "

Based on the above, it is clear at this stage of the proceeding that neither the trial court nor this court can determine, as a matter of law, that the acts of the doctor and the alleged mishandling of the transference phenomenon constitute medical malpractice. That issue raises questions of fact requiring the aid of an expert to analyze the occurrences in this case vis a vis the duty owed by a psychiatrist to his patient.

*Judgment affirmed. Quillian, C. J., McMurray, P. J., Shulman, P. J., Banke, Birdsong, Carley and Pope, JJ., concur. Deen, P. J., dissents in part.*

DECIDED OCTOBER 13, 1982 —
REHEARING DENIED NOVEMBER 1, 1982 —

*George W. Hart, Philip C. Henry,* for appellant.
*Lawrence B. Custer, Jerry J. Hynes, Hirsch Friedman,* for appellees.

DEEN, Presiding Judge, dissenting in part.

Mary Sue Mitchell was for several years, off and on, a patient of defendant Dr. Kleber, a psychiatrist. In 1979 she and her husband

filed a malpractice action against the codefendant alleging in brief that the latter had been negligent in his treatment and counseling of Mary Sue in that she became his patient in early 1971 for diagnosis and treatment of a mental disorder and that at various times from then on they, under his treatment, engaged in sexual intimacy resulting in the birth of a child. Kleber denied the truth of these allegations but turned them over to the appellant, who carried his liability insurance, for legal attention.

St. Paul Fire & Marine then filed the instant complaint for declaratory judgment, joining the Mitchells and Dr. Kleber, and moving for summary judgment on the basis that the suit, if the facts were as stated in the complaint, was a tort action not covered under its liability policy. It filed defensive pleadings on behalf of Dr. Kleber under a reservation of rights agreement, and in the declaratory action moved for partial summary judgment against its insured based on the proposition that it had no obligation to the extent that the Mitchells' actions sought recovery for sexual misconduct on his part. The Mitchells and Kleber also sought summary judgment, and these were granted to the extent of holding that appellant had a duty to defend the Mitchell actions, and that as to liability jury issues were involved. St. Paul and the Mitchells appeal these portions of the orders adverse to their respective interests.

## I.
### *As to Duty to Defend*

The policy in question specifies that the insurer will pay "all sums which the insured shall become legally obligated to pay as damages arising out of the *performance of professional services* rendered or which should have been rendered during the policy period by the insured . . . and the company shall have the right and duty to defend in his name and on his behalf any suit against the insured alleging damages, even if such suit is groundless, false or fraudulent." (Emphasis supplied.) Professional services is defined as meaning "injury, sickness, disease, death or destruction due to the rendering of or failure to render any professional service and shall be deemed to include the dispensing of drugs or medicine and the service by the insured as a member of a formal accreditation or similar board or committee of a hospital or professional society."

The seven count complaint, which is supported on motion by affidavits of the Mitchells, is based on the proposition that the defendant psychiatrist represented that Mrs. Mitchell's physical symptoms resulted from sexual maladjustments for which he

proposed to give therapy through mental and physical sexual exchange of information and stimulus. She alleged that he wrongfully manipulated the doctor-patient relationship "to the point where plaintiff's feelings were no longer transferred feelings of love for defendant as a psychiatrist but direct feelings of love for him as a person, beyond the phenomenon of transference. Moreover, defendant robbed plaintiff of her ability to control her feelings . . . Defendant wrongfully and negligently advised plaintiff that due to her condition she needed treatment by way of intimate, personal, and sexual contacts with him; such a relationship went beyond the accepted standards of treatment by psychiatrists."

The complaint further alleges that the first act of intercourse rendered her pregnant, that she suffered a miscarriage two months later, that when she told the defendant these facts he passionately upbraided her for destroying his child, that sessions ceased for a period of time until he "forgave" her, that he wished a child and they entered a period of physical relations of at least once a week, that she eventually became pregnant again and bore him a child. At some period after this she was diagnosed as suffering from an inoperable brain tumor. The complaints seek damages general and punitive for breach of contractual duty, shame and humiliation, recovery of sums paid for psychiatric treatment, loss of income, and failure to properly diagnose and timely refer to a specialist the presence of the brain tumor.

It is obvious that the claim must assert a liability for an act against which the insurer has a contractual duty to defend. *Great American Ins. Co. v. McKemie,* 244 Ga. 84 (259 SE2d 39) (1979). The insurer's motion for summary judgment does not include that part of the complaint alleging professional negligence for failure to discover or treat the brain tumor, but rests solely on lack of coverage as to the main allegations. We agree that the term "professional services" is unambiguous. We emphatically make no decision, nor did the trial court at this stage of the proceedings, as to the truth or falsity of the complaints. What should be held is that if in fact a psychiatrist manipulates feelings of inadequacy, dependence, and stress, which a patient comes to him to alleviate, by misusing the tools of his trade to his patient's injury in order to satisfy his own sexual desires, or if, without going to this extent, he negligently injures his patient by a failure to exercise a reasonable degree of care and skill he may be guilty of a tort or wrongful practice, but this alone does not, under the facts here, necessarily establish liability under the policy.

"To establish professional medical negligence the evidence presented by the patient must show a violation of the degree of care and skill required of a physician. Code § 84-924. Such standard of

care is that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally." *Williams v. Ricks,* 152 Ga. App. 555 (1) (263 SE2d 457) (1979). Ordinarily we could and would not say as a matter of law that the facts alleged in this complaint do or do not measure up to such a standard. The issue that must be decided in this case is where, as contended here, the defendant entered into a doctor-patient relationship, accepted the standard fees, represented himself as offering standard treatment for emotional and psychological complaints as well as physical ones, and assures his patient that the end result of such treatment will lead to greater happiness and security in her marriage, whether such actions and acts are so foreign[1] to the "professional services" represented as being rendered by a psychiatrist as to be or not to be covered under the broad general terms of the policy as performance of professional services. Under these circumstances "professional services" are those which the professional represents as being such and is paid for rendering, provided the Criminal Code and public policy are not *intentionally breached by intentional misconduct totally apart from treatment.*

We recognize that under Georgia law, construction of the policy is necessary, and exclusions from coverage are construed against the

---

[1] There is a considerable authority that sexual acts by a psychiatrist to and with his patient may be part of "professional services" rendered: "A larger number of psychiatrists — but probably still a small minority of all psychiatrists — favor a wide range of sexual experiences for adults, including selective adultery . . . The intimacy of psychiatrist and patient — usually a male psychiatrist with a female patient, rarely a female psychiatrist with a male patient or a therapist with a patient of the same sex — can be justified or rationalized on the ground that patients suffer from a lack of love and need warmth, caresses, and closeness . . . Various kinds of touching and feeling therapies came into prominence in the 1960s, and there were such aberrant treatment methods as nude group marathons in swimming pools . . . 'Laying on of hands' has been reintegrated into the medical school and nursing curriculums; touching and personal contact has been readopted as part of church worship — the 'tactile liturgy' . . . The fact that a small minority of therapists who had sexual relationships with their patients advocated this as a method of treatment surfaced in 1969 when the American Psychiatric Association expelled one of its members, James McCartney, an aging Jungian who called himself a psychoanalyst although he had had no formal psychoanalytic training, after he published a paper in *The Journal of Sex Research* advocating intercourse as therapy . . . A nationwide survey showed that more than 5 percent of male Ph.D. psychologists had had intercourse with patients and more than 10 percent had had other 'erotic contact.' More than 7 percent of male psychologists and more than 0.5 percent of female psychologists had had intercourse with patients within three months after the termination of therapy, and 80 percent of these had had intercourse with more than one patient." Jonas Robitscher, J.D., M.D., The Powers of Psychiatry, pp. 388, 421, 422, 423, 425 (1980).

insurer and in favor of providing the indemnity sought. *Mutual Life Ins. Co. of N. Y. v. Bishop,* 132 Ga. App. 816 (209 SE2d 223) (1974). The court's responsibility in construing a contract has been succinctly stated in *Standard Guaranty Ins. Co. v. Davis,* 145 Ga. App. 147, 151 (243 SE2d 537) (1978): "Courts, including appellate courts, are duty bound to be *just* before they are generous, and have no more right by strained construction, to make an insurance policy more beneficial by extending coverage contracted for than they would have the right to increase the amount of coverage." (Emphasis supplied.) Likewise we observe the rule stated in *Greer v. IDS Life Ins. Co.,* 149 Ga. App. 61 (253 SE2d 408) (1979) as follows: "In construing an insurance policy, '[t]he test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean.' " Here, the insured has unequivocally testified that in his professional view of psychiatric practice sexual intimacy in any form is not professional conduct. The insurer was not required to defend in the case of *Great American Ins. Co. v. McKemie,* supra, p. 85: "It is true that an insurer must defend even a groundless suit when the true facts of the case show no coverage. See examples in *Loftin v. U. S. Fire Ins. Co.,* supra, 106 Ga. App. at 291. ' "But a distinction must be drawn between groundless suits and actions which, even if successful would not be within the policy coverage." [Cit.] A claim based on *true* facts not within coverage is not groundless within the meaning of the policy, but simply one for which liability insurance is not afforded and which the insurer did not undertake to defend (though the insured may be liable).' "

Had Kleber admitted the truth of the allegations as to sexual acts and intimacy as charged (adultery, fornication and possible prostitution), it would be my opinion that no duty to defend would obtain. *Great American* insured against "bodily" injury or "property" damage but not "nuisance" or breach of other contractual duties. There everyone agreed as to the stipulated facts, hence a question of law existed as to whether there was coverage. Here the doctor denies the acts, therefore, the company is under a duty to defend to determine the truth of the facts.

II.

*As to Contract Coverage*

It is likewise contended that a jury issue remains as to the ultimate liability of the defendant doctor, both as to its existence and as to the facts from which it arises. In psychiatric relationships transference is an unconscious process on the part of the patient by

which he substitutes the therapist as the recipient of emotions of love or dependence, among others, which have arisen in his social relationships and which are at the base of his psychological difficulties. That the mishandling of the so-called transference phenomena can result in strong sexual feelings between psychiatrist and patient, whether on only the patient's side or on both, with deleterious consequences, is one of the dangers of the treatment. Harmful results may indeed result from the negligence of the psychiatrist. It is conceded that damages may be recovered in a proper case under similar facts in some jurisdictions, and they may be included in liability coverage for injuries resulting from professional services rendered which should not have been rendered. See Zipkin v. Freeman, 436 SW2d 753 (1968); Seymour v. Lofgreen, 495 P2d 969 (1972); Anclote Manor Foundation v. Wilkinson, 263 S2d 256 (1972); Cotton v. Kambly, 300 NW2d 627 (1980).

Other jurisdictions hold to the contrary and it is my view that Georgia should adopt what the writer believes to be the better rule as set out in Hartogs v. Employers Mutual Liability Ins. Co. of Wis., 391 NYS2d 962 (SC 1977). This involved an action by a psychiatrist against his professional liability insurer to recover his costs and expenses in defending an action brought by a former patient. He was a psychiatrist who convinced a patient to engage in a course of sexual activity with him over a period of thirteen months through his representations that it was necessary for the treatment of his patient's condition. When the patient filed suit against Dr. Hartogs he called upon his professional liability carrier to defend the action and his carrier disclaimed coverage. The action was defended by his own attorney and a judgment entered against him. The doctor then brought an action against his insurer to recover the costs and expenses incurred in defending the action. The doctor's insurer contended that the "treatment" administered by its insured did not constitute medical malpractice and was not covered under the policy. The appellate court agreed stating "the doctor administering the 'treatment' at all times knew, and has so stated in the previous trial and on this motion, that what he was doing was in no way pursuant to the doctor-patient relationship. The obvious purpose was to permit him to accomplish his personal satisfaction." 391 NYS2d 964. The court went on to state that "[t]he plaintiff [physician] knew that his actions were for his personal satisfaction and did not constitute medical practice. Therefore, as between the plaintiff and his insurer those actions could not constitute malpractice and were never intended to be included within the protective coverage of the malpractice policy." "There is a further reason to grant summary judgment to the defendant [insurer]. There are several situations in

which Courts as a matter of public policy refuse to allow themselves to be used to enforce illicit or immoral or unconscionable purposes. To cite two examples of the policy — they will not entertain suit to collect a gambling debt; they will disallow a recovery which will effect a forfeiture. The Court, as public policy, holds here that it will not afford this plaintiff resort to the processes of the Court. To hold otherwise would be to indemnify immorality to pay the expenses of prurience." 391 NYS2d at 965.

The court in Industrial Sugars v. Standard Accident Ins. Co., 338 F2d 673 (7th Cir. 1964) stated the rule in this manner: "A contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and *the Courts will not construe a contract to provide such coverage.*" (Emphasis supplied.) The public policy of Georgia favors stability of marriage and condemns illegal and immoral acts. The criminal laws of Georgia define adultery as follows: "A married person commits adultery when he voluntarily has sexual intercourse with persons other than his spouse and upon conviction shall be punished as for a misdemeanor." Ga. Code Ann. § 26-2009. "A contract will not be construed so as to authorize one of the parties to take advantage of his own wrong." *National Enterprises, Inc. v. Davis,* 140 Ga. App. 488, 489 (231 SE2d 490) (1976).

Compare *Porubiansky v. Emory University,* 156 Ga. App. 602 (275 SE2d 163) (1980) and *Harris v. Barfield Music House,* 18 Ga. App. 444 (1) (89 SE 592) (1916): "To keep a lewd house is penal under the laws of this State, and any person who knowingly rents or sells personal property to be used in such a house will not be assisted by the courts to recover such property or the value thereof. The contract, being *contra bonos mores,* will not support an action."

"Where a deed is executed and delivered in consideration of future illicit intercourse, and the grantee acquires possession under it, neither the grantor nor his heirs can recover the land . . . As was said by the able counsel for the defendant in error in his brief, 'it is a conveyance upon the set consideration of a vested remainder in consideration of concubinage for life, — so much land for so much lust.' " *Watkins v. Nugen,* 118 Ga. 372, 374-375 (45 SE 262) (1903).

Whether in any such psychological treatment the standard of care measures up to that ordinarily employed by the branch of the medical profession engaged in psychiatric treatment of problems such as that afflicting the plaintiff here, the court should not reach, as the acts and actions alleged herein are outside performance of legitimate "professional services." It may be further pointed out that exceptions do exist from the general rule requiring expert medical testimony respecting a physician's or surgeon's service to his patient.

". . . where a doctor undertakes to stitch a wound on his patient's cheek, and, by an awkward move, thrusts his needle into the patient's eye . . ." *Shea v. Phillips,* 213 Ga. 269, 271 (98 SE2d 552) (1957). ". . . a defendant chiropractor, in giving a patient an adjustment, were to take a hammer and shatter his backbone with a blow, or if a surgeon in performing an appendectomy were to take a knife and unintentionally slit the patient's throat . . ." *Caldwell v. Knight,* 92 Ga. App. 747, 752 (89 SE2d 900) (1955). The two above examples involve unintentional acts of the doctor while yet within the scope of attempted patient treatment. The action there was so plain and palpable as to constitute negligent malpractice that expert testimony was not deemed necessary. In the instant case we are considering illegal intentional criminal adulterous acts of consenting adults of a personal nature arising out of, but not within, the scope of professional treatment. It could be argued that here the action of the professional was so plain and palpable, a personal stepping away from the scope of legitimate professional medical treatment, that expert testimony regarding standards is unnecessary.

The facts in the case of Seymour v. Lofgreen, supra, discusses that the patient had suffered from, among other problems, a swelling of the stomach and had leg cramps and had sued her doctor for failure to diagnose the cause of her problem in that she was mentally ill. The latter question could be addressed by medical expert testimony, but the failure there to properly diagnose a case with legitimate treatment cannot be equated with, as here, the adulterous actions and acts arising out of the conduct but not within the scope of legal acts within professional psychiatric treatment in Georgia. Generally if there is coverage there exists a duty to defend. Likewise if it is clear from a given factual situation there is no coverage there is no duty to defend however groundless the charges may be.

I concur with Division 1 of the majority requiring the insurer to defend inasmuch as the doctor has denied all wrongdoing. If the latter prevails the insurer will also prevail as to any ultimate liability. If the doctor is adjudicated a wrongdoer in a jury trial, then it is my opinion there is no coverage. The personal acts do not represent legitimate professional treatment, but are personal misfeasance separate from coverage, as "nuisance" was separate from "bodily" and "property" coverage in *Great American.* This question of coverage is a question of law for the court and not for the jury. The majority is in effect saying that if medical experts were to testify that cutting off a patient's head would cure the patient's headache the question of medical malpractice or a personal assault on the patient remains a jury question. I must respectfully disagree.

The trial court did not err in holding that appellant had a duty to

defend its insured as outlined herein. It did err in denying appellant's motion for partial summary judgment as to paying any judgment under the acts and actions discussed which may be rendered against its insured if, in fact, the insured is adjudicated a wrongdoer by the jury.

The motion to stay the main actions until a final adjudication of this declaratory judgment should have been granted under the facts of this case.