**Janet H. OLSON, Petitioner,**

v.

**Bob J. MOLZEN, Respondent.**

Supreme Court of Tennessee.

Nov. 21, 1977.

Sidney W. Gilreath, Robert E. Pryor, Knoxville, for petitioner.

F. Graham Bartlett, McCampbell, Young, Bartlett & Hollow, Knoxville, for respondent.

OPINION

HENRY, Justice.

The sole question before the Court is whether a Doctor of Osteopathy may defend a negligence action on the basis of an exculpatory agreement executed by his patient prior to the rendition of services.

Plaintiff's suit was dismissed pursuant to a Motion for Summary Judgment under Rule 56, Tenn.R.Civ.P. The action of the trial judge was affirmed by the Court of Appeals, which held that the agreement was valid in all respects, and not against public policy.

I.

On September 17, 1973, Janet H. Olson, a pregnant, twenty-three year old unmarried woman, contacted Bob J. Molzen, at the time a practicing osteopath in Knoxville, and engaged his services for the performance of an abortion. On September 21, 1973, when she returned to Molzen's clinic, and prior to his performance of the abortion, she was required to execute a release, the pertinent portions of which read as follows: [1]

> I am aware of the minor risks and hazards, and realize that this type of surgical operation is no different than any other kind of surgical operation and has attending complications that may be beyond the control of the surgeon. I, therefore, release Doctor Molzen and his staff from

1. The full text appears as an appendix.

responsibility associated with any complications that may come up, or be apparent, in the next twelve (12) months.

\* \* \* \* \* \*

And, finally, I completely release Doctor Molzen and his staff from any present or future legal responsibility associated with performing an abortion on myself.

The abortion was then performed and two weeks later she returned to the Doctor's office for a check-up. She testified that she told him she "had been experiencing this nausea and that I didn't feel good." He gave her a vaginal examination and told her "that everything was fine."

About the middle of November she consulted a Knoxville gynecologist who advised her that she was pregnant and it was too late to perform an abortion. The child was born on April 9, 1974.

## II.

The courts of Tennessee have long recognized that, subject to certain exceptions, parties may contract that one shall not be liable for his negligence to another. *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960). In *Moss* the plaintiff rented a horse, equipped with bridle and saddle. After he had ridden a short distance the left stirrup strap broke, causing plaintiff to fall to the ground and inflicting serious injuries. In connection with the rental, plaintiff signed a release as follows:

I am hiring your horse to ride today and all future rides at my own risk. 207 Tenn. at 428, 340 S.W.2d at 903.

The Court held that "the plain intent of this agreement was that plaintiff assumed the risk incident to the hiring and riding of the horse, including the risk which caused the injuries sued for." *Id.* The Court accordingly affirmed the demurrer entered by the plaintiff to defendant's plea based upon the release.

*Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188 (Tenn.1973), in-

volved personal injuries sustained by a patron of Empress when a belt connected to a vibrator broke. The patron had executed a release which, among other things, provided for the assumption of the risk of injury and indemnification from "any and all liability attributable to the Spa. . . ." Following *Moss, supra*, this Court upheld the release and, relying upon *Trailmobile, Inc. v. Chazen*, 51 Tenn.App. 576, 370 S.W.2d 840, 844 (1963), held that "the public policy of Tennessee favors freedom to contract against liability for negligence." 503 S.W.2d at 190.

The last pertinent reported case in Tennessee is *Dixon v. Manier*, 545 S.W.2d 948 (Tenn.App.1976). There the Court, relying upon *Moss* and *Chazen, supra*, upheld the validity of a release from liability for negligence in a suit wherein a customer at a cosmetology school sustained injuries during a hair straightening treatment.

## III.

While these cases are relevant and make it clear that as a general rule a party may contract against his or her own negligence, they do not afford a satisfactory solution in a case involving a professional person operating in an area of public interest and pursuing a profession subject to licensure by the state. The rules that govern tradesmen in the market place are of little relevancy in dealing with professional persons who hold themselves out as experts and whose practice is regulated by the state.[2]

That one's status may affect his or her responsibility is recognized in *Williston on Contracts* § 1751 (3d ed. 1972), which states:

[S]ome relationships are such that once entered upon they involve a status requiring of one party *greater responsibility than that required of the ordinary person*, and, therefore, a provision avoiding liability is peculiarly obnoxious. (Emphasis supplied).

---

**2.** The practice of osteopathic physicians is regulated by statute. See Sec. 63–901, et seq., T.C.A.

## IV.

*Moss* points us in the direction of a controlling consideration, i. e. whether the exculpatory provision affects the public interest by recognizing the exceptions made for the benefit of the public. Generally our cases uphold exculpatory contracts between private contracting parties but, aside from those involving common carriers, no case has been decided wherein the public interest consideration has been discussed.

■ This was the primary factor that led the California Supreme Court in *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963), to hold that a release from future liability, as a condition of admission to a charitable hospital, was invalid. There the Court enumerated and discussed what it deemed to be the controlling characteristics of the transaction, as follows:

[a.] It concerns a business of a type generally thought suitable for public regulation.

[b.] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.

[c.] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.

[d.] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.

[e.] In exercising a superior bargaining power the party confronts the public ·with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.

[f.] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. 32 Cal.Rptr. at 37–38, 383 P.2d at 445–446.

We think these criteria are sound and we adopt them. It is not necessary that all be present in any given transaction, but generally a transaction that has some of these characteristics would be offensive. Here, we think all characteristics were present.

Applying the first criterion, we can hardly think of any area more suitable for public regulation than abortions. It took a decision of the Supreme Court of the United States to authorize them and define their limits. See *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In the aftermath of *Roe v. Wade*, the Tennessee General Assembly adopted Chapter 235 of the Acts of 1973, which was carried in the Official Code as Sec. 39–301, et seq., T.C.A. This enactment regulates abortions in Tennessee.

Dr. Molzen held himself out as being willing to perform abortions for the general public. This is obvious from the fact that he operated an abortion clinic. Janet Olson met the statutorily established standards. *See* Sec. 39–301, T.C.A.

■ Janet Olson wanted an abortion. Dr. Molzen performed abortions. It begs the question to say she could have gone to another doctor or that she elected to undergo a surgical procedure that was not mandatory. Perhaps so. However, there is no assurance that any other doctor would not have made a similar demand. The record does not show how many other physicians in the Knoxville area perform abortions, but we have no doubt but that the number is limited. Physicians are not required to perform abortions. *See* Sec. 39–304, T.C.A. She had a right to elect to have a legal surgical procedure performed even though there was no compelling medical necessity.

Prosser, *Law of Torts* § 68, at 442 (4th ed. 1971), recognizes this dilemma:

The courts have refused to uphold such agreements, however, where one party is at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.

Another of the bases suggested in *Williston on Contracts, supra,* for voiding exculpatory agreements is:

[A] relation often represents a situation in which the parties have not equal bargaining power; and one of them must either accept what is offered or be deprived of the advantages of the relation.

This is precisely the situation which Janet Olson faced.

The doctor not only exercised a superior bargaining power, but there is nothing to indicate that he made any provision for the payment of additional compensation or fees to obtain insurance or protection against negligence.

As a direct consequence of this transaction, Janet Olson placed her person under the control of Dr. Molzen subject to the risk of negligence after he had demanded that she contract away any cause of action that might arise.

A professional person should not be permitted to hide behind the protective shield of an exculpatory contract and insist that he or she is not answerable for his or her own negligence. We do not approve the procurement of a license to commit negligence in professional practice.[3]

■ Under the guidelines herein adopted, we hold that an exculpatory contract signed by a patient as a condition of receiving medical treatment is invalid as contrary to public policy and may not be pleaded as a bar to the patient's suit for negligence.

Reversed.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.

## APPENDIX

DOCTORS MEDICAL–SURGICAL CENTER
OUT–PATIENT ABORTION CLINIC
1104 MERCHANTS ROAD
KNOXVILLE, TENNESSEE   37912

I, _____Janet H. Olson_____, hereby request and authorize Dr. B. J. Molzen, and whomever he may designate as his assistants, to perform an abortion, (interruption of pregnancy) on myself. I authorize Doctor Molzen and his assistants to use whatever anesthetics he may deem necessary.

I am aware of all major and minor risks, hazards, and possible complications associated with this type of surgical operation, including the more common post-operative (after surgery) complications, such as:

(1) Retained products of conception, (placenta, or afterbirth) either in part or in whole, retained portions, either in part or in whole of an embryo, fetus, or any other tissue debris in the uterus in spite of standard surgical precautions.

(2) Bleeding and/or hemorrhage.

(3) General infection of the vagina, or uterus (womb) that could rarely occur during surgery, but would commonly occur if the patient does not follow post-operative instructions very specifically.

(4) Twin (double), tubal, or ectopic (abnormal) pregnancies, and bicornate uterus, (double uterus).

---

**3.** The California Court of Appeals in *Belshaw v. Feinstein*, 258 Cal.App.2d 711, 65 Cal.Rptr. 788 (1968), extended the *Tunkl* rule to physicians under the view that such contracts contravened public policy. In *Meiman v. Rehabilitation Center*, 444 S.W.2d 78 (Ky.1968), the Court held that an exculpatory contract signed by a patient undergoing therapeutic treatment at a rehabilitation center was invalid as against public policy.

I am aware of the minor risks and hazards, and realize that this type of surgical operation is no different than any other kind of surgical operation and has attending complications that may be beyond the control of the surgeon. I, therefore, release Doctor Molzen and his staff from responsibility associated with any complications that may come up, or be apparent, in the next twelve (12) months.

I also understand that $200 covers only an ordinary case, with ordinary post-operative progress. If complications should at any time occur that require hospitalization, I agree to go to a hospital of Doctor Molzen's choice and I agree to be responsible for any costs or bills associated with such hospitalization.

I certify that I have carefully read and will strictly follow the list of post-operative instructions titled, "What to Expect in the Next Few Days", realizing any deviation from these could result in complications in my post-operative progress, for which Doctor Molzen would not be responsible.

I also certify that I an under twelve (12) weeks pregnant, that I am age 18, or over, and that no guarantees express or implied, have been given as to performance of surgery, or the ultimate or final results of surgery.

And finally, I completely release Doctor Molzen and his staff from any present or future legal responsibility associated with performing an abortion on myself.