# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON
_____

|  |  |  |
|---|---|---|
| **WILLIE LOMAX and wife,** | ) | Shelby Equity No. 104517-1 |
| **BOBBIE LOMAX**, | ) | |
| | ) | |
| Plaintiffs/Appellants. | ) | |
| | ) | |
| VS. | ) | C. A. NO. 02A01-9607-CH-00163 |
| | ) | |
| **HEADLEY HOMES, a Tennessee** | ) | |
| **General Partnership composed of** | ) | |
| **Dennis Headley and Betty Headley**, | ) | |
| | ) | |
| Defendants | ) | |
| | 0 | |

<table>
<tr><td></td><td></td></tr>
</table>

| | |
|---|---|
| **FILED** | |
| **May 22, 1997** | |
| **Cecil Crowson, Jr.** | |
| **Appellate Court Clerk** | |

AND

**LEADER FEDERAL BANK FOR
SAVINGS and GEORGE E. BURTON**,

Defendants/Appellees.
_____

From the Chancery Court of Shelby County at Memphis.
**Honorable Neal Small, Chancellor**


**J. Alan Hanover**,
**Jeffrey S. Rosenblum**,
HANOVER, WALSH, JALENAK & BLAIR, PLLC, Memphis, Tennessee
Attorney for Plaintiffs/Appellants.


**Robert E. Craddock, Jr.**,
**O. John Norris, III**,
WYATT, TARRANT & COMBS, Memphis, Tennessee
Attorney for Defendants/Appellees Union Planters National Bank and George E. Burton.


OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**


**FARMER, J.**


**CRAWFORD, P.J., W.S.** : (Concurs)
**LILLARD, J.** : (Concurs)

Plaintiffs Willie and Bobbie Lomax appeal the trial court's order entering summary judgment in favor of Defendants/Appellees Leader Federal Bank for Savings[1] and George E. Burton. The trial court apparently granted the Defendants' motion for summary judgment based upon the provisions of the Construction Loan Agreement entered into between the Lomaxes and Leader Federal. We affirm the trial court's order as to Defendant George E. Burton. With regard to Defendant Leader Federal, however, we reverse and remand for further proceedings.

## *I.  Facts*

For purposes of the Defendants' summary judgment motion, the following facts were undisputed. In April 1993, the Lomaxes approached Leader Federal to obtain a construction loan for a home the Lomaxes planned to build in southeast Memphis. At the bank, the Lomaxes first spoke with Cheryl Hayes. Ms. Hayes informed the Lomaxes that their contractor, Headley Homes, was on Leader Federal's approved list of builders; that Leader Federal had an inspector in its employ who would make sure Headley Homes was paid only for work that was actually completed; and that Leader Federal would make disbursements to Headley Homes only for work that was actually completed.

In reliance on Ms. Hayes' representations,[2] the Lomaxes executed a Construction Loan Agreement with Leader Federal. Regarding Leader Federal's obligation to disburse funds thereunder, the Agreement provided that:

> Lender [Leader Federal] agrees to advance and disburse the loan, . . . in installments as work progresses in accordance with schedule attached, or if no schedule attached, then the Lender is authorized to disburse funds under its control in said construction loan account only in proportion to its inspector's report of progress or by architect's certificate accompanied by a proper affidavit from the contractor.

---

[1]After this litigation began, Leader Federal was acquired by Union Planters National Bank. Accordingly, this Court recently entered an order granting Leader Federal's motion to substitute Union Planters National Bank as Defendant/Appellee.

[2]In deciding this appeal, we express no opinion on the admissibility of the statements allegedly made by Ms. Hayes to the Lomaxes prior to their execution of the Construction Loan Agreement.

The Agreement also contained the following provision:

> Lender has no liability in connection with said improvements or the construction or completion thereof or work performed thereon and has no obligation except to advance the loan as herein agreed. The Borrower [the Lomaxes] acknowledges and hereby accepts the sole responsibility for the selection of his own contractor, materials, supplies and equipment to be used in the construction, and the Lender assumes no responsibility for the completion of the improvements according to the plans and specifications and for the contract price, all inspections by Lender or its representative for its benefit, and the Borrower should not rely on such inspections or acceptance by Lender to be for his protection regardless of the circumstances, representations or appearance as may hereinafter exist.

The Construction Loan Agreement authorized Leader Federal to disburse loan proceeds to the "Borrower or to the Contractor or any other persons furnishing labor, supplies or services for or in connection with the construction or completion of said improvements."[3] After executing the Agreement, the Lomaxes authorized Leader Federal to disburse the loan proceeds directly to their contractor, Headley Homes. Mrs. Lomax thought that Leader Federal would ask for the Lomaxes' permission each time it issued a check to Headley Homes. Mrs. Lomax later discovered that Leader Federal was issuing checks directly to Headley Homes without first seeking permission from the Lomaxes. When Mrs. Lomax questioned someone at Leader Federal about the payments, she was told that "that was the procedure."

Leader Federal's construction inspector was Defendant George E. Burton. In conducting his final inspection of the Lomaxes' home in March 1994, Burton authorized disbursements to Headley Homes for work that was never completed. Burton later admitted that he missed some items in the final inspection and that he "did a really bad job inspecting the Lomax home." As a result, the Lomaxes obtained a home which, contrary to Burton's final inspection report, was not substantially complete. Additionally, some of the construction work that had been completed contained blatant and obvious defects.

The Lomaxes subsequently filed this action against Headley Homes, Leader Federal,

---

[3]Although this provision authorized Leader Federal to disburse funds directly to the Borrower, the language of this and other provisions of the Agreement suggested that this option applied to situations where the Borrower and the Contractor were the same entity.

and Burton for the faulty construction of the Lomaxes' house. The Lomaxes' amended complaint sought to hold Leader Federal liable for its breach of the duty of good faith and fair dealing, negligence, and misrepresentation.[4] The complaint sought to hold Burton individually liable for his negligent inspection of the home.

Leader Federal and Burton filed a motion for summary judgment and attached a copy of the Construction Loan Agreement. The trial court granted the motion and directed the entry of a final judgment in favor of Leader Federal and Burton. *See* T.R.C.P. 54.02. On appeal, the Lomaxes present the following issue for review:

> Whether an exculpatory clause in a construction loan agreement can relieve a lender who negligently disburses loan proceeds to a builder for work that has not been completed from any and all liability associated with construction of a home, including blatant misrepresentations made by such lender.

Accordingly, this appeal requires us to determine whether the "exculpatory" provision contained in the Construction Loan Agreement is enforceable against the Lomaxes so as to bar their present action against Leader Federal. Whether the provision is an exculpatory clause is addressed later.

### II. Leader Federal's Duty to Disburse Construction Loan Proceeds

As a preliminary matter, however, we must determine what duty, if any, Leader Federal owed to the Lomaxes with respect to inspection of the Lomaxes' home and disbursement of the loan proceeds. If Leader Federal owed no duty to the Lomaxes, then the Lomaxes have no cause of action against Leader Federal and we need not decide the issue of the enforceability of the exculpatory provision contained in Leader Federal's contract.

In the absence of a contrary agreement between the parties, the general rule in Tennessee is that a lender owes no duty to a borrower to disburse loan proceeds for the borrower's

---

[4]In their complaint, the Lomaxes also asserted a claim for violation of the Tennessee Consumer Protection Act of 1977. *See* T.C.A. §§ 47-18-101 to -5002 (1995 & Supp. 1996). On appeal, however, no issue has been raised regarding the trial court's dismissal of this claim.

benefit. In disbursing loan proceeds, therefore, a lender has no affirmative duty to protect the borrower's interests. *Goodner v. Lawson*, 232 S.W.2d 587, 589-90 (Tenn. App. 1950) (in absence of agreement, loan association had no duty to pay mechanic's liens out of loan proceeds prior to disbursing loan proceeds to contractor); *see also Forest Inc. v. Guaranty Mortgage Co.*, 534 S.W.2d 853, 856-59 (Tenn. App. 1975) (in absence of express contractual provision or industry custom, lender had no duty to subordinate creditors, such as suppliers, materialmen, and developer, to inspect construction and advance funds to contractor only in proportion to percentage of construction completed).

An exception to the general rule arises, however, where a lender assumes such a duty by express or implied agreement. *Goodner v. Lawson*, 232 S.W.2d at 589-90. For example, where a lender retains the loan proceeds and assumes the responsibility of discharging prior liens, the lender may be liable for its negligent failure to perform this duty. *Prater v. Fidelity Trust Co.*, 34 S.W.2d 205, 207 (Tenn. 1930); *see also Crum v. AVCO Fin. Servs.*, 552 N.E.2d 823, 827 (Ind. Ct. App. 1990) (lender who agrees to disburse loan proceeds for certain purpose must exercise due care in performance of obligation); 59 C.J.S. *Mortgages* § 297 (1949) ("If . . . the mortgagee agrees to apply the proceeds for a certain purpose he is liable for a failure to do so.").

Although a lender's duty to a borrower when disbursing construction loan proceeds apparently has not been considered by Tennessee courts,[5] courts in other jurisdictions have recognized that a lender's duty in this situation is governed by the provisions of the construction loan agreement between the lender and the borrower. Thus, in *Henry v. First Federal Savings & Loan Ass'n*, 459 A.2d 772, 775 (Pa. Super. Ct. 1983), a Pennsylvania court held that, in the absence of a contractually assumed duty, a loan association owed no duty to borrowers to inspect construction of the borrowers' home prior to making progress payments to the borrowers' contractor. Although the construction loan agreement's terms gave the association the right to enter the construction premises and to conduct inspections, the agreement did not require the association to do so. Similarly, in *Daniels v. Army National Bank*, 822 P.2d 39, 42 (Kan. 1991), the Kansas court held that, in the

---

[5]*Cf. Forest Inc. v. Guaranty Mortgage Co.*, 534 S.W.2d 853, 856-59 (Tenn. App. 1975) (addressing lender's duty to subordinate creditors when lender disburses construction loan proceeds).

absence of a contractual provision to the contrary, the bank had no duty to inspect the construction site for the protection of the borrowers prior to disbursing loan proceeds. There, the contract authorized, but did not require, the bank to inspect the progress of the work and the quality of the workmanship. *See also Meyers v. Guarantee Sav. & Loan Ass'n*, 144 Cal. Rptr. 616, 619-20 (Ct. App. 1978) (holding that, in absence of contractual provision imposing such duty, savings and loan association had no duty to inspect construction to determine that work had been done according to specifications prior to making payments to contractor from loan proceeds).

In contrast, the Construction Loan Agreement at issue in the present case did impose a duty, albeit a limited one, on Leader Federal relative to its disbursement of the loan proceeds. The Agreement authorized Leader Federal "to disburse funds under its control in said construction loan account only in proportion to its inspector's report of progress." By its express terms, this provision imposed a two-fold duty on Leader Federal: (1) Leader Federal, through its inspector, was obligated to make a report of progress of the construction;[6] and (2) Leader Federal was obligated to disburse loan proceeds only in proportion to the inspector's report of progress. Inasmuch as Leader Federal retained the loan proceeds and expressly assumed the duty to disburse the proceeds subject to the provisions of the parties' Agreement, Leader Federal may be held liable for its negligent performance of this duty. *Prater v. Fidelity Trust Co.*, 34 S.W.2d at 207; *Goodner v. Lawson*, 232 S.W.2d at 589-90; 59 C.J.S. *Mortgages* § 297 (1949).[7]

Although we conclude that Leader Federal did owe a duty to the Lomaxes, we find it necessary to explain why we have described the duty as a limited one. By the express terms of the Construction Loan Agreement, Leader Federal only assumed a duty to inspect the progress of the work and to make loan disbursements in proportion to such progress. Leader Federal did not undertake to inspect the construction for defective, as opposed to incomplete, work. Accordingly,

---

[6]As previously indicated, the Construction Loan Agreement also gave Leader Federal the option, in disbursing the loan proceeds, of relying on an architect's certificate, accompanied by the contractor's affidavit. Inasmuch as Leader Federal chose to rely on its own inspector's report of progress, we need not address the question of Leader Federal's liability had it instead chosen to rely on the architect and contractor.

[7]Moreover, in Tennessee the common law imposes upon Leader Federal a duty of good faith in performing this contractual obligation. *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *accord Crum v. AVCO Fin. Servs.*, 552 N.E.2d 823, 827 (Ind. Ct. App. 1990) (reaching same conclusion under Indiana law).

to the extent that the Lomaxes' complaint seeks to recover against Leader Federal for any defects in the construction of their home, we conclude that the trial court properly granted summary judgment in favor of Leader Federal.[8]  ***See Daniels v. Army Nat'l Bank***, 822 P.2d at 42 (absent contractual provision imposing such a duty, bank had no duty to inspect construction site for quality of workmanship prior to disbursing loan proceeds to contractor); ***Henry v. First Fed. Sav. & Loan Ass'n***, 459 A.2d at 775 (absent provision in construction loan agreement imposing such duty, loan association had no duty to inspect construction work for quality of workmanship as well as quantity of work before disbursing construction loan funds); *see also **Davis v. Nevada Nat'l Bank***, 737 P.2d 503, 505 (Nev. 1987) (normally, lender "has no duty to exercise care to identify unworkmanlike or deficient construction").[9]

---

[8]We recognize that, under some circumstances, a finder of fact might have difficulty ascertaining what constitutes defective construction, as opposed to merely incomplete construction.  At this point in the proceedings, however, we need not address such a hypothetical issue.

[9]In ***Davis v. Nevada National Bank***, the Nevada court limited the circumstances under which a borrower could sue for defective construction to cases where:

> (1)     the lender assumes the responsibility or the right to distribute loan proceeds to parties other than its borrower during the course of construction;
>
> (2)     the lender is apprised by its borrower of substantial deficiencies in construction that affect the structural integrity of the building;
>
> (3)     the borrower requests that the lender withhold further distributions of loan proceeds pending the satisfactory resolution of the construction deficiency;
>
> (4)     the lender continues to distribute loan proceeds in complete disregard of its borrower's complaints and without any bona fide attempt to ascertain the truth of said complaints; and
>
> (5)     the borrower ultimately is damaged because the substance of the borrower's complaints was accurate and the borrower is unable to recover damages against the contractor or other party directly responsible for the construction deficiencies.

***Davis v. Nevada Nat'l Bank***, 737 P.2d at 506.  On appeal, the Lomaxes suggest that their action against Leader Federal falls within this exception because, during construction of their home, Mrs. Lomax complained about Headley Homes' work to Leader Federal employees.  Even if this Court were to adopt the exception set forth in ***Davis v. Nevada National Bank***, we conclude that the facts of this case do not fall within such exception.  Here, Leader Federal was not apprised by the Lomaxes "of substantial deficiencies in construction that affect[ed] the structural integrity of the building." *Id.*  At most, the evidence reveals that Mrs. Lomax complained that Headley Homes "was slow about doing the work" and that the "work wasn't going right."  Further, Mrs. Lomax admitted that she never requested Leader Federal to withhold further disbursements of the loan proceeds pending the satisfactory resolution of Mrs. Lomax's complaints.  Finally, at this point in the proceedings, there is no showing that the Lomaxes will be unable to recover damages

### III. *The Construction Loan Agreement's Exculpatory Provision*

Having defined the duty owed by Leader Federal to the Lomaxes, we next must determine the validity of the Construction Loan Agreement's exculpatory provision. As an initial matter, we must determine whether the provision at issue even qualifies as an exculpatory clause. An exculpatory clause is one which deprives one party to the agreement of the right to recover damages for harm caused by the other party's negligence. *Crawford v. Buckner*, 839 S.W.2d 754, 755-56 (Tenn. 1992). The clauses typically contain such language as "landlord . . . shall not be liable to tenant . . . for any injury to the person or loss of or damage to property for any cause," *Id.* at 755, and "I completely release [the doctor] and his staff from any present or future responsibility." *Olson v. Molzen*, 558 S.W.2d 429, 430 (Tenn. 1977). It is not necessary that the word "negligence" appear in the exculpatory clause. *Empress Health & Beauty Spa v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973).

Upon reflection, we believe that the provision at issue in this case meets the above definition of an exculpatory clause because the provision seeks to relieve Leader Federal of any liability in connection with inspection and completion of construction of the Lomaxes' home. Specifically, the provision states that Leader Federal has no liability in connection with the construction, that Leader Federal assumes no responsibility for completion of the construction, and that the Lomaxes should not rely on Leader Federal's inspections of the construction to be for the Lomaxes' protection. As previously discussed, Leader Federal assumed a duty under the Construction Loan Agreement to inspect the progress of the construction and to disburse funds only in proportion to its report of progress. Having expressly assumed this duty, Leader Federal may be held liable for its negligent performance of such duty. *Prater v. Fidelity Trust Co.*, 34 S.W.2d at 207; *Goodner v. Lawson*, 232 S.W.2d at 589-90; 59 C.J.S. *Mortgages* § 297 (1949). Accordingly, to the extent that the foregoing provision seeks to relieve Leader Federal from any liability associated with its performance of this duty, we conclude that the provision qualifies as an exculpatory clause.

---

against the contractor, Headley Homes.

As for the validity of the exculpatory clause, Tennessee courts "have long recognized that, subject to certain exceptions, parties may contract that one shall not be liable for his negligence to another." *Olson v. Molzen*, 558 S.W.2d 429, 430 (Tenn. 1977). Indeed, "the public policy of Tennessee favors freedom to contract against liability for negligence." *Empress Health & Beauty Spa v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973). In the absence of fraud or overreaching, therefore, such exculpatory provisions generally are held to be enforceable. *Houghland v. Security Alarms & Servs.*, 755 S.W.2d 769, 773 (Tenn. 1988).

Nevertheless, under certain circumstances, such exculpatory clauses may be invalid as contrary to public policy. In *Olson v. Molzen*, 558 S.W.2d 429 (Tenn. 1977), our supreme court adopted criteria to be used in determining the validity of a particular exculpatory provision. In order for such an exculpatory provision to be held invalid under the "public interest" exception, the underlying transaction must possess at least some of the following characteristics:

> (a.) [The transaction] concerns a business of a type generally thought suitable for public regulation.
>
> (b.) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.
>
> (c.) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.
>
> (d.) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.
>
> (e.) In exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.
>
> (f.) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Olson v. Molzen*, 558 S.W.2d at 431 (quoting *Tunkl v. Regents of University of California*, 383 P.2d 441, 445-46 (Cal. 1963)).

In *Olson v. Molzen*, the court explained that not all of these transactional criteria needed to be present to invalidate an exculpatory provision under the public interest exception, but the court did not indicate just how many of the criteria needed to be present, other than "some." *Olson v. Molzen*, 558 S.W.2d at 431. In any event, the court found that all of the characteristics were present in that case. There, the plaintiff signed a release which purported to relieve an osteopath from any legal responsibility associated with the osteopath's performance of an abortion on the plaintiff. In invalidating the release, the court analyzed the application of the public interest criteria:

> Applying the first criterion, we can hardly think of any area more suitable for public regulation than abortions. . . .
>
> [The doctor] held himself out as being willing to perform abortions for the general public. This is obvious from the fact that he operated an abortion clinic. [The plaintiff] met the statutorily established standards. . . .
>
> [The plaintiff] wanted an abortion. [The doctor] performed abortions. It begs the question to say she could have gone to another doctor or that she elected to undergo a surgical procedure that was not mandatory. Perhaps so. However, there is no assurance that any other doctor would not have made a similar demand. The record does not show how many other physicians in the Knoxville area perform abortions, but we have no doubt but that the number is limited. Physicians are not required to perform abortions. . . . [The plaintiff] had a right to elect to have a legal surgical procedure performed even though there was no compelling medical necessity.
>
> . . . .
>
> The doctor not only exercised a superior bargaining power, but there is nothing to indicate that he made any provision for the payment of additional compensation or fees to obtain insurance or protection against negligence.
>
> As a direct consequence of this transaction, [the plaintiff] placed her person under the control of [the doctor] subject to the risk of negligence after he had demanded that she contract away any cause of action that might arise.
>
> . . . .
>
> Under the guidelines herein adopted, we hold that an exculpatory contract signed by a patient as a condition of receiving medical treatment is invalid as contrary to public policy and may not be pleaded as a bar to the patient's suit for negligence.

*Id.* at 431-32.

The supreme court similarly invalidated an exculpatory provision in *Crawford v. Buckner*, 839 S.W.2d 754 (Tenn. 1992). In that case, as a condition of renting an apartment from the defendants, the plaintiff was required to sign the defendants' standard form lease. The lease contained an exculpatory clause which purported to relieve the defendants from any liability to the plaintiff "for any injury to the person or loss of or damage to property for any cause." *Id.* at 755. After the plaintiff suffered injuries while escaping a fire in the apartment complex, the plaintiff sued the defendants for negligence, citing the defendants' negligent failure to maintain the fire alarm and other theories. *Id.* As before, the court applied the public interest criteria to the facts of the case and concluded that all of the criteria were present:

> [F]irst, we conclude a residential lease concerns a business of a type that is generally thought suitable for public regulation. Our conclusion is bolstered by the fact that the legislature of this state has seen fit to regulate this area, and that other states, . . . have enacted legislation regulating the residential landlord-tenant relationship. . . .
>
> Second, it is clear we no longer live in an agrarian society where land, not housing, was the important part of a rental agreement. Nor do we live in an era of the occasional rental of rooms in a private home or over the corner grocery. Residential landlords offer shelter, a basic necessity of life, to more than a million inhabitants of this state. . . . Accordingly, it is self-evident that a residential landlord is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. In addition, a residential landlord holds itself out as willing to perform a service for any member of the public who seeks it. . . .
>
> With respect to the fourth public interest criterion, as a result of the essential nature of the service and the economic setting of the transaction, a residential landlord has a decisive advantage in bargaining strength against any member of the public who seeks its services. A potential tenant is usually confronted with a "take it or leave it" form contract, which the tenant is powerless to alter. The tenant's only alternative is to reject the entire transaction.
>
> Moreover, due to its superior bargaining position, a residential landlord confronts the public with a standardized adhesion contract of exculpation, which contains no provision whereby a tenant can pay additional reasonable fees to obtain protection from the landlord's negligence. The lease in this case is a good example. In her affidavit in opposition to the defendants' motion for summary judgment, [the plaintiff] testified that she was given the defendants' standard lease form to sign, and was never offered the opportunity to pay additional reasonable fees to obtain protection from the landlords' negligence. . . .
>
> Finally, we conclude that by definition a residential lease places the person and the property of the tenant under the control of the landlord, subject to the risk of carelessness by the landlord and his

> agents. . . .
>
> . . . .
>
> Based on the foregoing, we conclude that the exculpatory clause in the residential lease in this case is contrary to public policy.

*Id.* at 757-59.

Turning to the case at bar, we conclude that these public interest criteria apply to the home construction loan transacted by the Lomaxes and Leader Federal. As an initial matter, we note that the consumer lending activities of banks and other financial institutions fall within the type of business generally thought suitable for public regulation. The legislature of this state, for example, has enacted legislation authorizing financial institutions to make loans and imposing certain restrictions on such activities. *See* T.C.A. §§ 45-2-1101 to -1108 (1993 & Supp. 1996) (banks); T.C.A. §§ 45-3-701 to -707 (1993) (savings and loan associations); T.C.A. §§ 45-4-601 to -610 (1993) (credit unions); T.C.A. §§ 45-5-401 to -405 (1993 & Supp. 1996) (industrial loan and thrift companies). The United States Congress also has enacted laws regulating this area. *See* 12 U.S.C.A. §§ 83--86 (West 1989) (lending powers of national banks); 12 U.S.C.A. §§ 2801--2810 (West 1989 & Supp. 1997) (home mortgage disclosure requirements); 15 U.S.C.A. §§ 1601--1667 (West 1982 & Supp. 1997) (truth in lending requirements).

Moreover, Leader Federal, the party seeking exculpation, was engaged in performing a service of great importance which was a practical necessity for some members of the public. *See Crawford v. Buckner*, 839 S.W.2d at 758 (noting that shelter is "basic necessity of life"). In her deposition, Mrs. Lomax testified that neither she nor her husband had ever been involved in the construction of a new home, although they had purchased existing homes before. When the Lomaxes decided to buy a new house during the spring of 1993, they began looking at existing homes, but they were unable to find a home that suited their needs. As a result, like many couples, the Lomaxes decided to build a new home.[10] The Lomaxes found a lot that they liked, purchased the lot from Headley Homes, and then proceeded to negotiate with Headley Homes to construct the

---

[10]In this regard, we observe that the public interest exception requires only that the service be a "practical" necessity; the service need not be a "compelling" necessity. *Olson v. Molzen*, 558 S.W.2d at 431.

home. In order to finance the construction project, the Lomaxes turned to Leader Federal. In this regard, Leader Federal held itself out as willing to make home construction loans to any members of the public who sought such loans, provided the customers met certain established standards. Here, the Lomaxes met the loan qualifications and, thus, were extended a home construction loan by Leader Federal.

With respect to the fourth public interest criterion, as a result of the essential nature of the service and the economic setting of the transaction, Leader Federal had a decisive advantage in bargaining strength against the Lomaxes or any other member of the public who sought its services. This conclusion is supported by evidence in this case that the Lomaxes were confronted with a "take-it-or-leave-it" form agreement which they were powerless to alter. In his deposition, Wayne Anderson, the Senior Vice President in charge of Leader Federal's Construction Lending Department, gave the following testimony:

Q. Is this the same construction loan agreement the bank uses on every single one of its construction loan agreements?

A. Yes.

Q. Every provision that's contained in the seven pages of this construction loan agreement is in every other construction loan agreement.

A. Yes.

Q. Including the paragraph, the famous paragraph which is, I believe, 3-H, which I will refer to as the exculpatory clause.

A. Yes.

Q. Has Leader Federal ever agreed to take out the provision contained in paragraph 3-H in any of its construction loan agreements, to the best of your knowledge?

A. No.

Q. It's in every single one of those agreements.

A. Every single one.

Q. To the best of your knowledge, do you know if anyone has ever asked that Leader Federal remove that provision?

A. No.

Q.    But if they would ask, Leader Federal would refuse; is that correct?

A.    Yes.

Under these circumstances, the Lomaxes' only alternative was to reject the entire transaction with Leader Federal.

Based on the foregoing testimony, we also conclude that the Construction Loan Agreement executed in this case possessed sufficient characteristics of an adhesion contract to satisfy the fifth public interest criterion.[11] In extending a loan to the Lomaxes, Leader Federal confronted them with a standardized Construction Loan Agreement which authorized Leader Federal to disburse the loan proceeds to the Lomaxes' contractor in accordance with the progress reports of Leader Federal's inspector. In a subsequent provision, however, the form Agreement purported to exculpate Leader Federal from any liability in connection with completion of the construction and, relative thereto, provided that the Lomaxes had no right to rely on Leader Federal's inspections of the construction. The Lomaxes were never offered the opportunity to pay additional reasonable fees to obtain protection from Leader Federal's negligence in disbursing the loan proceeds. Although customers might or might not choose to pay higher interest rates to obtain such protection, in our view the important consideration is that the Lomaxes were never offered such an opportunity.

Finally, we conclude that by definition the Construction Loan Agreement placed the Lomaxes' property under the control of Leader Federal, subject to the risk of carelessness by Leader Federal and its agent, George Burton. Although the Agreement advanced a construction loan to the Lomaxes, the Agreement placed the loan proceeds under the control of Leader Federal. Because of Burton's admitted carelessness, some of the loan proceeds were applied toward phases of construction which never were completed. Despite the fact that the Lomaxes' loss may have been

---

[11]We recognize that the Construction Loan Agreement executed in this case may not possess all of the characteristics of an adhesion contract as recently set forth by the supreme court in *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1996). Nevertheless, we believe that the Agreement possesses enough adhesive qualities to satisfy the fifth public interest criterion. In reaching this conclusion, we are reminded that not all of the public interest criteria must be present in order for an exculpatory provision to be found invalid as contrary to public policy. *Olson v. Molzen*, 558 S.W.2d at 431; *accord Crawford v. Buckner*, 839 S.W.2d at 757; *Smith v. Peoples Bank*, No. 01A01-9111-CV-00421, 1992 WL 117061, at *4 (Tenn. App. June 3, 1992).

occasioned by the acts of Leader Federal's employee, if the Agreement's exculpatory provision were upheld, the Lomaxes still would be responsible for repaying the entire amount of the loan proceeds to Leader Federal.

Based on the foregoing analysis of the public interest criteria, we conclude that the exculpatory clause in the Construction Loan Agreement executed by the Lomaxes and Leader Federal is contrary to public policy and, thus, is unenforceable. Accordingly, we reverse the trial court's order granting summary judgment to Leader Federal.

## IV.  Burton's Liability for Negligence

We affirm, however, that portion of the trial court's order granting summary judgment to George Burton. The Lomaxes' negligence action against Burton is based on section 552 of the *Restatement (Second) of Torts*:

(1)     One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in the obtaining or communicating of the information.

(2)     Except as stated in Subsection (3), the liability stated in Subsection (1), is limited to loss suffered

(a)     by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b)     through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991) (quoting *Restatement (Second) of Torts* § 552 (1977)).

The Supreme Court of Tennessee has adopted section 552 as the appropriate standard for actions by third parties against professionals and business persons based on negligent

misrepresentation. *John Martin Co.*, 819 S.W.2d at 431; *see also Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991). Under this standard, a defendant may incur liability in tort when, despite a lack of contractual privity with the plaintiff,

> (1)     the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*
>
> (2)     the defendant supplies faulty information meant to guide others in their business transaction; *and*
>
> (3)     the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*
>
> (4)     the plaintiff justifiably relies upon the information.

*John Martin Co.*, 819 S.W.2d at 431 (emphases in original).

The principal requirements of this rule are that "the information supplied must be false and the supplier must have failed to exercise reasonable care or competence in obtaining or communicating the information." *McFarlin v. Watts*, 895 S.W.2d 687, 690 (Tenn. App. 1994). The rule is not limited to professionals but includes non-professionals involved in business activities or transactions. *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 131 (Tenn. 1995). As in other negligence actions, the defendant may raise the plaintiff's comparative negligence as a defense. *John Martin Co.*, 819 S.W.2d at 432.

Applying the foregoing standard, we conclude that the trial court properly entered summary judgment in favor of Burton on the Lomaxes' claim under section 552. Although the first three elements of this cause of action appear to be present in this case, the undisputed evidence shows that the fourth element has not been met because the Lomaxes did not justifiably rely on the faulty information provided by Burton.

With regard to the first two elements of this cause of action, it is undisputed that Burton, acting in the course of his employment, supplied faulty information which was intended to guide others in their business transaction. Specifically, Burton falsely represented that certain phases in the construction of the Lomaxes' home had been completed when, in fact, the construction had

not been completed. Moreover, the intended result of this information was to influence Leader Federal to disburse the Lomaxes' construction loan proceeds to the contractor, Headley Homes. As for the third element, the evidence indicates that Burton failed to exercise reasonable care in obtaining or communicating this information, at least with regard to the final inspection report.

Regarding the fourth element, however, the undisputed evidence demonstrates that, contrary to their contention, the Lomaxes (as opposed to Leader Federal) did not act in reliance upon Burton's faulty inspection report. The Lomaxes' amended complaint alleges that, in completing the closing transaction on the house, the Lomaxes relied on the representation contained in Burton's final inspection report that the home was "O.K. for satisfactory completion." The uncontradicted deposition testimony of Mrs. Lomax, however, fails to support this allegation of reliance.

The purpose of the closing was to convert the Lomaxes' construction loan into a permanent mortgage. Mrs. Lomax's deposition reveals that, prior to the closing, the Lomaxes visited the site on a regular basis to observe the progress of the construction of their home. In accordance with this practice, the Lomaxes inspected the site on the day of the closing. At the time of the closing, therefore, the Lomaxes knew which portions of the construction had not been completed. The Lomaxes were given a final accounting statement showing the amount of loan proceeds being disbursed to Headley Homes, the amount of proceeds being retained to pay for uncompleted items, and the items that had not been completed. The final accounting statement showed that, upon completion of the closing, most of the loan proceeds would be disbursed to Headley Homes. Because the Lomaxes had inspected the house themselves and knew many of the construction items had not been completed, they asked the closing attorney if more of the loan proceeds could be retained and then disbursed at a later time when the incomplete items were finished. Despite their knowledge that the house was not complete and that most of the construction loan proceeds were being disbursed to Headley Homes, the Lomaxes still chose to complete the closing. Mrs. Lomax explained that, if the Lomaxes had not closed on the date in question, they would have incurred a penalty.

Based on the undisputed evidence, we conclude that summary judgment was properly granted because no genuine issue of material fact exists with regard to whether the Lomaxes relied

upon the faulty information provided by Burton.  The evidence reveals that, in spite of their knowledge of the discrepancy between the percentage of the house that was completed and the percentage of the loan proceeds that were being disbursed, the Lomaxes proceeded to close on the house in order to avoid paying a penalty.  Under these circumstances, the Lomaxes could not have justifiably relied on the information provided in Burton's final inspection report.

### V.  Conclusion

The trial court's judgment in favor of Burton is affirmed; however, the trial court's judgment in favor of Leader Federal is reversed and this cause remanded for proceedings consistent with this opinion.  Costs of this appeal are taxed to Leader Federal, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
LILLARD, J. (Concurs)